DAVIS, Judge.
Appellant, M.A.B., seeks reversal of a finding that she was guilty of neglect of a dependent adult under chapter 415, Florida Statutes, and an order to expunge her name from the abuse/neglect registry. At all times pertinent to this appeal, M.A.B. was the Administrator at Tender Loving Care Nursing Home (TLC).
R.L. was a quadriplegic with a C3 spinal cord injury from a gunshot wound. He was shot on September 14,1988. He was hospitalized at Palm Beach Gardens Medical Center until January 12, 1989. He was then transferred to Treasure Coast Rehabilitation Hospital. Authorities at Treasure Coast eventually decided that R.L. was ready to be transferred to a less acute care facility, and contacted TLC.
Although Sheria Morris, TLC Director of Nursing, advised against accepting R.L. because of the extent of his dependence on caregivers due to the nature of his injuries, M.A.B. agreed to accept him. He was transferred to TLC on July 18, 1989. The first day R.L. was at TLC the nurses were concerned about being able to care for him, and M.A.B. felt that she had been misled as to the extent of his injuries and dependence. That day or the very next day, M.A.B. called Treasure Coast and said they would have to transfer R.L. back because TLC could not care for him. Treasure Coast said they had no bed available and would not take him back. These concerns were brought to the attention of R.L.’s doctors, and Dr. Dayton put an order in R.L.’s chart on July 20,1989, to discharge him back to a rehabilitation facility. R.L.’s care was being paid for by Palm Beach County. There is a letter dated July 21, 1989, from M.A.B. to the Palm Beach County official responsible for paying for R.L.’s care, stating that she felt she had been misled as to the severity of his condition, and that he needed to be transferred to a more acute care facility.
R.L. was given the room across the hall from the nurses station, so they could keep a better eye on him. He was anxious and scared because of being in a new situation and being utterly dependent upon the ventilator to breathe. When he first arrived at TLC he required almost constant care, and very frequent suctioning. Since a C3 quadriplegic cannot cough up mucus, he must be suctioned when mucus plugs form, to prevent the plugs from suffocating him. The doctor’s orders for R.L. required suctioning “PRN,” meaning “as needed.” Although some nurses refused to work with R.L., over time things calmed down, and he required less frequent suctioning. There was a monitor in his room, so the nurses could hear if he was in distress, there was also an alarm on his ventilator to alert them of an emergency need for suctioning. He was checked regularly by the nurses on rounds.
On the night of August 21,1989, one nurse and one nurse’s aide were scheduled to work on 1 Southwest, the floor where R.L.’s room was located. When the nurse’s aide came on shift at 11 there was a nurse from the 3-11 shift in R.L.’s room. When the next nurse came on duty at midnight (she was an hour late due to a family emergency), she checked R.L. and he was resting comfortably and showing no signs of distress. Therefore she did not disturb him. She checked him again at 1 a.m. with the same results. At 1:50, Nurse Brooks was helping a nurse on another wing with an emergency when the nurse’s aide heard the ventilator alarm go off. They *1254 do not know exactly how long the alarm had sounded before she heard it. The aide called the Nurse who went immediately to R.L.’s room and found him blue. She called for 911 and began to attempt to resuscitate him. She was not successful. The autopsy showed R.L. expired from the effects of a mucus plug.
The Agency adopted the findings of fact and conclusions of law of the hearing officer who heard this case. That order includes a finding that M.A.B. “kept R.L. at TLC until he died on August 21, 1989” despite Dr. Dayton’s discharge order. The order also finds as a matter of fact that M.A.B. failed to ask the supplier of the ventilator equipment to provide in-service training to her staff. Paragraph 18 of the findings of fact paraphrases the opinions offered by Joyce Steier, a career R.N. and nursing home administrator who was offered by HRS as an expert in nursing home administration, to wit.:
R.L. was neglected by Respondent by her failure to make a more diligent effort to discharge R.L.; by failing to provide an in-service training to her staff after his arrival; by failing to follow the doctors transfer orders; by failing to contact the Office of Licensure and Certification (OLC); and by failing to sufficiently notify R.L.’s doctor about her staffs inability to properly care for R.L.
Appellant asserts that'there was no competent substantial evidence to support these findings of fact. Determinations regarding the weight of evidence or the credibility of witnesses are peculiarly within the province of the finder of fact and will not be disturbed on appeal. Clegg v. Chipola Aviation, Inc., 458 So.2d 1186 (Fla. 1st DCA 1984). The issue before this Court is whether the order is supported by competent evidence. Clegg, supra. While fact-finding is the role of the lower tribunal, “an agency determination will be set aside if it depends on a fact not supported by competent evidence in the record.” Williams v. Dep’t of HRS, 522 So.2d 951, 955 (Fla. 1st DCA 1988).
The finding of fact that M.A.B. kept R.L. at TLC despite the doctor’s transfer order is not supported by competent substantial evidence in the record. The only evidence that M.A.B. did anything to actively keep R.L. at TLC was the testimony of Sheria Morris, Director of Nursing, who said that she called Mrs. King, the Treasure Coast social worker and Mrs. King agreed to having R.L. discharged back to Treasure Coast the next day.' However, Nurse Morris further testified, she spoke with Mrs. King a few minutes later, and Mrs. King told her that she had spoken with M.A.B. and that M.A.B. felt that TLC could care for R.L. “and besides she did not have a bed at her facility.” A hearsay objection was made to this testimony, and the ruling was “I’ll note that it is hearsay for the record. And if it’s not linked up to further testimony, of course, it will serve no purpose.” There was no other testimony to support the claim that M.A.B. took active steps to keep R.L. at TLC or discouraged Treasure Coast from taking R.L. back. In fact, all of the evidence indicates that M.A.B. made efforts to have R.L. transferred.
Ann Taylor testified by deposition that she was the ease manager at Treasure Coast in charge of R.L.’s case, and that she was the person with whom Sheria Morris spoke, and that she was the one who told M.A.B. that Treasure Coast did not have a bed and could not take R.L. back. When asked “[M.A.B.] wanted to return [R.L.] to your facility?” she replied “Yes.”
LPN Charlene Kennedy testified that M.A.B. asked her to follow through on getting R.L. discharged back to Treasure Coast when Dr. Dayton put discharge orders into his chart. She was also told by representatives of Treasure Coast that the facility had no beds available.
There was also testimony from Mr. Kos-ner, Director of Professional Services with Positions Geriatric Services, Inc., the company for which the doctors caring for the nursing home patients worked. It was his job to oversee day to day operations. It was he who was negotiating with Westshore Hospital to transfer R.L. there after Treasure Coast refused to have R.L. back. Kosner testified that M.A.B. was in favor of the transfer of R.L., and that he did not know of any way she ever tried to prohibit his transfer.
*1255 Nurse Steier opined that M.A.B. did not make diligent enough efforts to transfer R.L. This is different from deliberately keeping him at the nursing home, but many of the same facts are relevant. An expert’s opinion which is based upon incomplete or inaccurate facts cannot be competent substantial evidence. Sabre Marine v. Feliciano, 461 So.2d 985, 987-88 (Fla. 1st DCA 1984). Nurse Steier testified on cross-examination that she was unaware of all of the transfer efforts which were undertaken by M.A.B. when she formulated her opinion. The Hearing Officer made no specific findings regarding the competency of Steier’s opinions, merely reciting as finding of fact number 18 what her opinions were. It would appear from this record that this opinion was without proper foundation, but this Court cannot tell how much weight was given to it by the hearing officer, or whether there were credibility determinations which caused the hearing officer to accept this opinion. Therefore, this cause must be remanded for further findings of fact, to give the hearing officer an opportunity to make these determinations on the record.
Finally, the order finds as a fact that it was the opinion of the expert, Joyce Steier, that M.A.B. neglected R.L. by “failing to sufficiently notify R.L.’s doctor about her staffs inability to properly care for R.L.” At oral argument, we were informed that this order was entered before the preparation of the transcript of the hearing. After reviewing the transcript, we can find no record support for this finding of fact. Nurse Steier did not say this.
Accordingly this cause is reversed and remanded for further proceedings consistent with this opinion.
BOOTH and LAWRENCE, JJ., concur.